### HAAS v. PONZ, Limited, et al.
### No. 10220.

District Court, D. Colorado.

May 3, 1934.

Otto Friedrichs and Carle Whitehead, both of Denver, Colo., for plaintiff.

Hubert D. Waldo, Jr., of Greeley, Colo., Chas. C. Reif, of Minneapolis, Minn., and Paul W. Lee (of Lee, Shaw & McCreery), of Denver, Colo., for defendants.

SYMES, District Judge.

The issues presented in this action are: (1) The validity of complainant's patent No. 1,926,900, dated September 12, 1933, application filed November 19, 1931; and (2) its infringement by defendants.

Admitting the application and issuance of the patent, defendants deny generally any infringement, and affirmatively allege the device is not a patentable invention within the meaning of the statutes, because it is so nearly like devices of the prior art as not to require invention, and to be merely a matter of mechanical skill not involving invention. And, further, it is void because Haas was not the original and first inventor of any material or substantial part of any of the alleged improvements claimed, which were known and used by others before his alleged discovery, and were patented or described in printed publications more than two years prior to his application. A number of patents for similar devices are listed in the answer and, furthermore, it is alleged plaintiff is seeking a broader construction for his claims than is justified, in order to bring within the same the devices that the defendants admittedly have made and sold.

The patent, No. 1,926,900, is for catamenial devices. The principal object is to provide an absorbent pad and means for conveniently inserting the same in the female organ. Another object is to combine in a single unit this absorbent pad for insertion with an inserting applicator, which acts as a container for the pad, so that the pad can be furnished inclosed in the applicator, and inserted without removing it therefrom, and so that the applicator can be discarded after use. A still further object is the provision of a novel method of manufacturing the pads, wherein an elongated body of absorbent material, having a thread extending longitudinally therethrough, with one end of the thread extending beyond the end of the body, is initially compressed to form a compact pad of sufficient compactness to retain its shape until moistened. By the time the application emerged from the Patent Office with its approval, the claims allowed were reduced to two, to wit:

"1. A catamenial device comprising: a relatively long strip of absorbent material; and a thread stitched throughout the length of said strip, said thread extending beyond one extremity of said strip to form a withdrawing member, said strip being highly compressed to form a relatively small self-sustaining core with said thread depending therefrom.

"2. The method of forming a catamenial pad comprising: forming a relatively elongated strip of absorbent material, stitching a thread along the center of the strip for the entire length thereof and continuing the stitching beyond one end of the strip to provide a pull cord, and then highly compressing the strip to form a relatively small, tight core of sufficient compactness to retain its shape until moistened."

This compressed core so described, is placed in an outer tube of paper, cardboard,

or some other cheap, soluble material, which acts as a container. An inner tube of similar material is slid into one end of this tube and holds the cotton pad or core in place.

In use, the tube, one end of which is rounded, is inserted into the female organ, the rounded edge facilitating the insertion. The inner tube is then pressed inwardly and expels the compressed pad or core. Both tubes are then removed, leaving the core in place, with the pull cord projecting out on the exterior. The natural body secretions are absorbed by the pad, causing it to expand. The pad can be removed by pulling the extension of the cord that is sewed longitudinally through the entire length of the material before it is compressed into the cylindrical pad. It comes out in an elongated manner unraveling, the form of stitching insuring the removal of all the material. Another advantage is that the applicator, or container, as well as the pad itself, are easily disposed of. The sterilized pad is not touched by hand.

The evidence discloses that Dr. Haas, a regular physician, resident of Denver, first thought of this device in April, 1931, while in Los Angeles. After submitting it to and receiving the approval of several physicians, he returned home and worked his idea out. In September, 1932, almost a year after the date of his application through the efforts of the witness de Robert, a promoter, he met the defendant Packard. Meetings and negotiations in regard to financing, manufacturing, licensing and putting the device on the market followed, in the course of which Haas made a full disclosure of the device to Packard, then engaged in the automobile parts business in Greeley, Colo. Nothing came of these negotiations, and the plaintiff began to manufacture and put the device on the market under the name of "Tampex." He met with some success until the following year, April, 1933, when he found a similar article on sale made in Greeley, called "Ponz," backed and promoted by the defendant Packard, and who incorporated "Ponz, Ltd."

This company set up a plant at Greeley, Colo., and manufactured some of the alleged infringing devices. It sold some of its product in Denver, and established state agents in California and Ohio, and in a few scattered towns elsewhere in the United States.

The Ponz device is made of a similar absorbing material cut in a relatively square shape instead of elongated. A cord is attached and sewed in with the same stitch as Tampex, the stitching, however, extending only half way longitudinally. For the balance of the length of the material the cord is simply looped around the other end. The material is then compressed into the same cylinder shaped core and placed in an applicator or container, similar to Tampex. It is inserted into the female organ in the same manner, the string depending outside. On removal the pull of the string causes the pad to compress and come out in the shape of a solid pad or ball, instead of unraveling longitudinally like Tampex. It is claimed that the absorbent material, when cut square, has the advantage of making a tighter plug, has greater absorption, and that its removal is easier and less irritating. Both pads, when put in water expand, laterally and longitudinally. It is claimed, and is probably true, that the lateral expansion of Ponz, when unconfined, is greater than Tampex, but is less longitudinally.

The Ponz device is medicated with an antiseptic designed to sooth the membrane it contacts and to kill odors. There is medical testimony, however, that the use of an antiseptic necessarily causes some irritation.

The two devices are similar in the following particulars: They are designed for and perform the same functions; occupy the same position in the female organ when in use; look the same; use the same applicator, and are applied in the same manner; both are highly compressed cores of absorbent material folded alike, and have the same string device for removal. The natural body secretions cause both to expand or swell; any difference in the expansion is of course limited by the walls of the vagina. The main differences are: The shape of the material before being compressed, one being rectangular, the other square; the fact that the cord attachment is only sewed half way into the Ponz pad and then looped over the end, while in the Tampex device the string is stitched through the entire length longitudinally.

The basic idea of Haas was to avoid the excessive swelling of material that made withdrawal difficult; so he designed his material and stitching so the pad would expand longitudinally, while other similar articles, including Ponz, described in the other patents cited, expand laterally. Further, his method of stitching causes the pad to unfold when the cord is pulled, while all the others tend to compress.

The advantages claimed for Ponz are: Greater absorption, due to use of more ma-

terial and the difference in the stitching; that in withdrawing the Ponz pad comes out like a plug-instead of unraveling like Tampex, and that the body secretions cause it to expand like a ball, thus giving support to the uterus. These differences, however, are matters of degree only, and not fundamental.

This particular container or applicator and method of insertion is not disclosed in the other patents. The Millner device, patent No. 1,884,089, October 25, 1932, is the nearest in design disclosed in the prior art. It consists of a relatively thin disk of compressible absorbent material of uniform thickness, with the cord attached at the center. This disk is inserted by placing the finger in the center and pushing the disk into a position somewhat above that it is to occupy, with the string depending. This causes it to fold over and assume the thimble shape when in place, as shown in the drawing. The string is then drawn downwardly, with the result that the protuberant crown, or central portion of the pad, is retracted, and the material compressed or telescoped within the surrounding portions of the disk. It is withdrawn by pulling the string.

If this description is correct, it is apparent that it is of different shape, is inserted in an entirely different manner, having no cylinder or device for that purpose, and assumes an entirely different shape when in use. Likewise the action of the pad in removing is different.

Other patents cited disclose devices not exclusively intended for catamenial purposes, but generally to apply and hold more effectively medical substances to the cavities of the body, such as the rectum, etc. In addition to using an absorbent material, such as cotton, they have an outer shell, or container of gelatinous or semirigid material, forming the shell. Unlike Tampex, they all compress upon removal, do not unravel, and there is no evidence that any of them were successful from a commercial point of view. I conclude that the Haas patent is valid.

This being so, there is no question but that there was infringement. The testimony of the defendant and his witnesses discloses that this art was entirely unknown to him until he contacted Dr. Haas. In the course of their negotiations for an interest in his device, full disclosure was made, and he became thoroughly familiar with the idea, its construction, the machine proposed to be used, and at this time had no thought of competing; then having decided not to finance Haas or become a licensee, he proceeded methodically to imitate or improve on it without infringing, taking the advice of local lawyers, as well as an expert patent lawyer. He conducted experiments and changed from the stitched string to the loop device in September, 1933, after receipt of notice of a patent infringement. It is fair to say that Mr. Packard did this openly, and as far as the record discloses, in the belief that he was not violating any strict legal rights of the plaintiff. Equitable principles, however, apply, and defendants' good faith is, under the circumstances, no defense.

Findings of fact and conclusions of law and a decree agreeable to these views may be submitted.